**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **V. CHARLES DONNELLY**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No. **20-3654 PJM** |
| **STATE OF MARYLAND**, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

This is a case in which, after many decades, Plaintiffs seek to right what they believe is a grievous wrong. Despite having encountered a substantial array of legal hurdles in the past, they will be given a chance to try again.

In summary the tale, as told by Plaintiffs, is as follows:

They are (or their predecessors-in-interest were) landowners along the western shore[1] of the Patuxent River in Calvert County, Maryland. Years ago, the State of Maryland (State) constructed a road (then known as Route 2, now known as Solomons Island Road) between the landowners' properties and the shoreline of the River. In the mid-1950s, the State determined that it needed to fortify Route 2 by constructing a bulkhead along the shoreline of the landowners' properties. Accordingly, in 1957, by agreements with the then landowners, the State obtained

---

[1] The shoreline at issue is referred to in the pleadings as the "western" shoreline of the Patuxent River. That is a correct characterization insofar as it refers to the shoreline that faces the St. Mary's County shoreline across the River from the Calvert County side. To be clear, the shoreline in issue is the shoreline on the Calvert County side of the Patuxent River, as opposed to the St. Mary's County side.

rights of way over the landowners' properties in order to construct the bulkhead.  In exchange for the rights of way, the State granted to each landowner the right to construct essentially any pier they might wish off the planned bulkhead.  The State obtained the rights of way and constructed the bulkhead.[2]

From all that appears, a few landowners got approval and built their piers off the bulkhead. Others, however, took longer to request to build, with the consequence that, by a series of maneuvers over decades, the State and/or the County (which succeeded to the State's interest in the rights of way and bulkhead) repeatedly rejected, first temporarily, then permanently, the requests.  In 2012, V. Charles Donnelly and other landowners (Solomons One, LLC; Solomons Two, LLC; DiGiovanni's Dock of the Bay, Inc.; James Seymour; and Prime Island Properties, LLC sued the Board of County Commissioners for Calvert County (County) and the State in Maryland state court for money damages for breach of contract as an alternative to seeking enforcement of the right to erect piers.[3]  In the first phase of suit, *Donnelly I*, the Circuit Court for Calvert County held in favor of those plaintiffs,[4] determining that they  indeed had the contractual right to construct piers.   The Circuit Court also held that the County and State's denial of

---

[2] *Black's Law Dictionary* (11th ed.) defines a "right-of-way" variously as "the right to pass through property owned by another" or "the strips of land subject to a nonowner's right to pass through." The Court understands that the rights of way in this case were not merely rights "to pass through" Plaintiffs' lands, but rather to occupy and build upon the strips of land between the edge of Route 2 (Solomon's Island Road) and the shoreline. The Court further understands that, as of today, the combined strips of land, running from the edge of Solomons Island Road to the shoreline include a paved public parking lot, a boardwalk, and the bulkhead.

[3] The State was dismissed from the state suit in 2016, arguing that it could not be held liable for money damages because, as against it, Plaintiffs retained only the right to construct piers, not to collect money damages.

[4] To be clear—and this will have relevance later on—current Plaintiffs Conner, LLC, Solomons Island Yacht Club, and Christopher J. Moore were not parties to the state litigation.  For the sake of simplicity, unless the context requires otherwise, when the Court refers to "Plaintiffs," it means "current Plaintiffs or their predecessors in interest."

Donnelly's and Solomons One, LLC's joint application to construct a pier was a breach of that contractual right.[5] Following an appeal, the Maryland Court of Special Appeals ("CSA") agreed and sent the case back to the Circuit Court for a trial on money damages.  At trial, plaintiffs (again, one of whom was current Plaintiff Donnelly, who was also acting as counsel for all) sought to prove the fair market value ("FMV") of the piers as of the date of the trial (August 2016), but the trial judge ruled that the breach of contract had in fact occurred on June 13, 2012, when the County last denied Donnelly's and Solomons One, LLC's joint pier application.  Accordingly, the trial court held that Plaintiffs had failed in their proof, since they had offered no evidence of FMV as of June 13, 2012.

Plaintiffs appealed again, but this time the CSA ruled against them.  Not only, said the appellate court, had there been a failure of proof as to the relevant date of the FMV, but—for the first time and, from all that appears, with minimal briefing by the parties—the CSA ruled that, because the plaintiffs had not actually built piers, they in any event held only unvested riparian rights which the State could supersede at any time without providing compensation.[6]  Additionally, the CSA held that the County could not bargain away its zoning authority.

This Court finds it useful to slow walk the key features of how the case progressed in state court.  The holding of the CSA came despite the fact that the County and/or State, for years, had continuously denied the requests of the landowners to construct the piers, in effect blocking any

---

[5] Because the other plaintiffs in *Donnelly I* (Solomons Two, LLC; DiGiovanni's Dock of the Bay, Inc.; James Seymour; and Prime Island Properties, LLC) had not filed pier applications with the County and State, the Circuit Court reserved for subsequent determination whether the County and State's denial of Donnelly and Solomons One, LLC's pier application could be considered an anticipatory breach of contract with respect to those plaintiffs.  As far as this Court can determine, that issue may never have been decided by the state court.

[6] In their Complaint in this Court, Plaintiffs allege that this issue was not before the CSA for decision.

effort on their part to erect piers.[7]  This, said the CSA, the State and County could do, with the result that the landowners would be entitled to no compensation at all.  All the while the CSA seemed to abide the fact that the State and County, at least by implication, could continue to enjoy the benefits of the rights of way and the bulkhead which previously had been part of the landowners' land and which the landowners had delivered to them, in exchange for which the landowners were to get the right to build the piers.  As Plaintiffs see things, the protracted history of the County's and State's maneuvers seems to be little more than a governmental shell game. As of this initial phase of the proceedings, the Court is prepared to give them the chance to show why that may be so.

Plaintiffs Donnelly; DiGiovanni's Dock of the Bay, Inc.; Prime Island Properties, LLC; Conner LLC; Solomons Island Yacht Club, Inc.; and Christopher J. Moore for themselves and/or as successors in interest to owners of shoreline property along Solomons Island Road[8] bring the present suit against Defendants Board of County Commissioners of Calvert County ("County") and the State of Maryland ("State").  They contend that Defendants have deprived them of constitutionally protected property rights, specifically alleging, among others, claims for the unconstitutional taking of property without just compensation as well as breach of contract. As indicated, in the 2000s and 2010s, some of the Plaintiffs—Donnelly, DiGiovanni's Dock of the Bay, Inc. and Prime Island Properties LLC—sought compensation for the loss of their pier rights through state administrative proceedings and state court actions.  Having failed to obtain money damages for breach of contract from the County in state court, those three Plaintiffs, plus three new ones (Conner, LLC, Solomons Island Yacht Club, Inc., and Christopher J. Moore), come to

---

[7] Had Plaintiffs been permitted to build the piers, then, per the rationale of the CSA, their riparian rights would have vested.

[8] *See supra* Note 4.

federal court seeking compensation for—in addition to their main claims for regulatory taking/inverse condemnation and breach of contract—substantive due process and equal protection violations under 42 U.S.C. § 1983, constitutional impairment of contract, and breach of the implied covenant of good faith and fair dealing.

First and foremost, the relatively recent decision by the U.S. Supreme Court in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), represents the outer layer of the onion that needs to be peeled to analyze what might otherwise seem to be a straightforward application of the doctrine of res judicata, at least as to the three Plaintiffs who were plaintiffs in the state proceedings (Donnelly; DiGiovanni's Dock of the Bay, Inc.; and Prime Island Properties, LLC). But while allowing the present case to proceed as to all Plaintiffs, including the three original state court plaintiffs, may seem at odds with the application of that doctrine, this case presents a number of unique circumstances. After engaging with *Knick* and peeling away several other layers of the case's complicated history, the Court holds that Plaintiffs are entitled to go forward in this Court as to some, if not all, of their claims.

For the reasons that follow, then, the County's Motion to Dismiss, or in the Alternative for Summary Judgment, ECF No. 16, will be **GRANTED IN PART** and **DENIED IN PART**. The State's Motion to Dismiss, ECF No. 17, will be **GRANTED IN PART** and **DEFERRED IN PART**.

## I.      BACKGROUND[9]

Solomons, Maryland, also known as Solomons Island, is located at the mouth of the Patuxent River in southern Calvert County, Maryland. Plaintiffs are similarly situated property owners on Solomons Island who claim that by contract they (or their predecessors in interest) hold

---

[9] A timeline of the events about to be described is set forth in Appendix A hereto.

or at least held, rights to construct piers into the Patuxent River.  Compl. ¶ 2, ECF No. 1.  According to Plaintiffs, each of them has or at least had the right to construct a pier of their choosing into the river by virtue of 1957 contracts that the State Roads Commission ("SRC") (predecessor in interest to the State Highway Administration) and Plaintiffs' predecessors in interest executed as part of a state highway project intended to expand the western shoreline of Solomons Island.  *Id.*  By virtue of these contracts, SRC acquired from the landowners rights of way along the shoreline of Solomons Island so that it might extend the shoreline and build a bulkhead to run parallel to the highway then known as Route 2, now known as Solomons Island Road.  *Id.*  About 30 property owners who owned land along Route 2 extending from the edge of Route 2 to the Patuxent River shoreline signed contracts with the State.  In exchange for the release of their "water rights, including oyster rights leased from the State and other unspecified riparian rights, the SRC granted Plaintiffs the "right to construct, maintain or repair any pier structure they may desire to erect outside the proposed bulkhead."  *Id.* ¶ 2, 17.  The SRC subsequently signed deeds to the property owners memorializing the transaction that were recorded among the Calvert County land records. *Id.* ¶ 2.

According to Plaintiffs, in the 1960s, 1970s, and early 1980s, a few commercial piers were permitted to be built off the bulkhead.  *Id.* ¶ 18.  But in February 1986, things changed.  As summarized by the CSA in *Donnelly II*:

> ". . . Solomons Island was subject to a 1986 zoning ordinance that imposed a moratorium on the construction of new commercial piers. In 2009, Calvert County enacted the Solomons Town Center Master Plan ("2009 Master Plan") and Zoning Ordinance ("2009 Zoning Ordinance"). The 2009 Master Plan adopted a general policy against "the proliferation and duplication of private commercial piers along the public bulkhead" on the Patuxent River. In accordance with this policy, the 2009 Zoning Ordinance prohibited the construction of new commercial piers longer than 117 feet in "the C3 Sub-area located along the public boardwalk."

*Donnelly II,* at 2.

The landowners did not go "gentle into that good night."  In April 2012, Plaintiff Donnelly and Solomons One, LLC filed a joint tidal wetlands application with the State, the County, and the U.S. Army Corps of Engineers, seeking authorization to construct a commercial pier in the Patuxent River.  *Id.* ¶ 21.  On April 10, 2012, the State denied the application on the grounds that (1) Plaintiffs' alleged contract rights were superseded by the State Tidal Wetlands Act of 1970; (2) the Tidal Wetlands Act prohibits non-water-dependent structures on the proposed commercial pier; and (3) the proposed piers conflicted with the County's Master Plan.  *Id.*  The County quickly allied itself with the State.  On June 13, 2012, the County also denied the property owners' application, asserting that the property owners had no enforceable contractual right to build commercial piers off the bulkhead and that in any case such a right was terminated by the 2009 amendments to the Master Plan.  *Id.* ¶ 22.  Donnelly and his neighbor appealed the County's decision to the Calvert County Board of Appeals which, as it turned out, held that Donnelly and his neighbor still had a contractual right to construct piers, subject to the approval of the U.S. Army Corps of Engineers.  *Id.* ¶ 23.  The Circuit Court for Calvert County thereafter affirmed the decision of the County Board of Appeals.  *Id.* ¶ 25.

The already labyrinthine state court litigation continued following the County's 2012 denial of the pier application.  *See State of Maryland, Dep't of the Env't, et al. v. Donnelly,* Md. Ct. of Spec. App., No. 1446, Sept. Term 2013 (Apr. 20, 2015) (unreported) (*Donnelly I*); *Donnelly, et al. v. State, et al.*, Md. Ct. of Spec. App., No. 2151, Sept. Term 2016, and No. 1187, Sept. Term, 2018 (Nov. 14, 2019) (*Donnelly II*)).  Donnelly and other landowners (Solomons One, LLC, Solomons Two, LLC, DiGiovanni's Dock of the Bay, Inc., James Seymour, and Prime Island Properties, LLC) brought suit against the County and State in the Circuit Court for Calvert County

for breach of contract, anticipatory breach of contract, and declaratory judgment, alleging that, over a protracted period, the County and State had interfered with Plaintiffs' pier rights as granted by the 1957 contracts.  Compl. ¶ 24.  Again the Circuit Court found in favor of Plaintiffs, holding that they continued to have the right to construct piers by virtue of the 1957 contracts and that their contracts had been breached when Defendants denied their pier application.  *Id.* ¶ 25.  The County and State appealed to the Maryland Court of Special Appeals ("CSA").  *Id.*  On April 20, 2015, the CSA affirmed the Circuit Court's judgment, acknowledging once again that "[a]ppellees [did] [Donnelly, et al.] possess a contractual right to construct a pier onto the Patuxent River that was not merged into the 1957 deeds conveying the Right of Way to the SHA.  Accordingly, the circuit court was deemed legally correct in issuing a declaratory judgment in favor of Appellees." *Donnelly I*, at 18.  The CSA remanded the case to the Circuit Court for a determination of money damages.  *Id.* at 26.

The Circuit Court for Calvert County set trial on plaintiffs' claim for damages against the County and State for August 11, 2016.  Compl. ¶ 28.  Prior to the trial date, however, the State moved for summary judgment, asserting that, because the Plaintiffs retained the right to construct piers, the State could not be found liable for damages, presumably only for enforcement of the right to construct piers.  Compl. ¶ 27.  The Circuit Court, agreeing, orally granted the State's motion, holding that the State could not be liable for contractual damages because the only right Plaintiffs held vis-à-vis the State was the right to construct piers.  *Id.* ¶ 27.  The case then proceeded to trial on Donnelly's claims for money damages against the County only.  *Id.* ¶ 28.  At trial, Donnelly presented expert testimony as to the fair market value ("FMV") of his proposed pier as of the date of trial, which is to say, as of August 2016.  *Id.*  But the state trial judge—rightly or wrongly—held that the date for determining FMV was the date the contract was breached (which

he deemed to be in either in 2009 when the County at least temporarily banned all new commercial pier construction or in 2012 when Plaintiffs' pier application was denied for the last time) and therefore excluded Donnelly's expert evidence of FMV as of 2016. *Id.* ¶ 28. Donnelly, however, asked the court if he could proffer the reports of his experts, which the court permitted. *Donnelly II*, at 3. In his proffer, Donnelly continued to argue for damages based on the FMV of the piers as of 2016. *Id.* However, the County moved for judgment on the grounds that the jury had already been dismissed and that no substantive evidence of damages had been admitted as of the 2012 date, which the court at first denied, instructing the parties to submit written offers of proof. *Id.* The County then renewed its motion for judgment while Donnelly moved for a new trial. *Id.* This time the court denied Donnelly's motion and entered judgment in favor of the County, holding that "the Plaintiff may elect a monetary remedy for the fair market value of the pier right breach at the time of the breach, in this case June 13, 2012, said damages and not condemnation values," while at the same time declaring that the County may not exercise its zoning authority to extinguish Plaintiff's vested contract right to build a pier for any purpose." *Id.* But, again, because Donnelly had not submitted proof of damages as of the June 13, 2012, date, the court determined that he had failed in his proof. *Id.* Donnelly appealed to the CSA. Compl. ¶ 28.

As a Southern Maryland waterman might say, more water was to pass under the bridge. On November 14, 2019, the CSA affirmed the judgment of the Circuit Court in favor of Calvert County. *Donnelly II*, at 8. But this time the CSA also held—for the first time and from all that appears with at most minimal briefing on the point[10]—that the County could properly exercise its zoning authority to alter or extinguish Plaintiffs' pier rights without compensation because such a right is riparian in nature and, if not actually exercised, could always be extinguished without

---

[10] *See supra* Note 6.

compensation.  *Id.* at 10 ("[T]he State of Maryland and its municipalities may extinguish unexercised riparian rights without compensating the owner.") (citing *Harbor Island Marina, Inc. v. Bd. of Cty. Comm'rs of Calvert Cty., Md.*, 286 Md. 303, 319 (1979)).  Further, in addressing Plaintiffs' argument that they held "vested contract rights," the CSA held that the County may not enter into an agreement to suspend its zoning authority, in consequence of which Plaintiffs had no rights at all.  *Id.* at 15.

Curiously, the CSA also stated that the denial of Donnelly's pier application in 2012 did not actually extinguish Donnelly's pier right.  *Id.* at 16 ("The County's denial, however, merely prevented Donnelly from exercising his pier right in a particular manner. The County did not purport to alter or extinguish the underlying right. To be sure, the County may have extinguished Donnelly's pier right earlier, when it enacted the 2009 Zoning Ordinance.  In that event, Donnelly's pier right would have been extinguished *before* it was breached, which would leave Donnelly with no legal claim whatsoever.") (emphasis in original).  But alternatively, even if the County could extinguish his pier right, the CSA explained, Donnelly could not recover the FMV of that right because he had brought a contract claim rather than a condemnation action and a municipality may extinguish a riparian right without compensation.  *Id.*  In affirming the judgment of the Circuit Court, the CSA also observed that Donnelly had elected to close his case and submit a written offer of proof as to damages but then failed to meet his burden of proof when he submitted evidence of the value of the proposed pier project as of 2016 instead of the value as of 2012, which, assuming Plaintiffs had any right to build to begin with (the CSA simultaneously said they did not) the CSA deemed the operative date for assessing damages.  *Donnelly II*, at 17.[11]

---

[11] The CSA's observation about FMV can only be understood as *obiter* because of the court's simultaneous holding that Plaintiffs had no vested right to build piers in any event.  Therefore, the issue of FMV—as of any date—would necessarily be academic.

Plaintiffs filed a petition for a writ of certiorari with Maryland's highest court, the Maryland Court of Appeals, which was denied on March 27, 2020. *Donnelly v. State*, 467 Md. 697 (2020).

On December 17, 2020, some eight months later, Donnelly; DiGiovanni's Dock of the Bay, Inc.; and Prime Island Properties, LLC joined by three new plaintiffs—Conner, LLC; Solomons Island Yacht Club, Inc.; and Christopher J. Moore—filed the present case in this Court.

As indicated, in this Court Plaintiffs assert several claims: regulatory taking/inverse condemnation against Defendant County (Count I) and Defendant State (Count II); deprivation of substantive due process, in violation of 42 U.S.C. § 1983 against both Defendants (Count III); disparate treatment in violation of the Equal Protection Clause, 42 U.S.C. § 1983 against both Defendants (Count IV); breach of contract against both Defendants (Count V); impairment of contract against both Defendants (Count VI); and breach of the implied covenant of good faith and fair dealing against both Defendants (Count VII). *See* Compl. ¶¶ 35–70.

The State has moved to dismiss the case and the County has moved to dismiss or in the alternative for summary judgment, arguing primarily that the Complaint should go out on the basis of res judicata and/or the *Rooker-Feldman* doctrines. *See* State Mem. in Supp. of Mot. to Dismiss ("State Mem."), ECF No. 17-1; Cty. Mem. in Supp. of Mot. to Dismiss or in the Alternative for Summ. J. ("Cty. Mem."), ECF No. 16-1. Defendants argue further that, even if the action is not barred by res judicata or *Rooker-Feldman*, the Complaint fails to raise a substantial federal question as required for this Court to have jurisdiction and, as to all counts, that it fails to plausibly state a claim. *See id.* In addition, the State submits that Eleventh Amendment immunity bars any claims against it in federal court and that Plaintiffs cannot assert § 1983 claims against it because

the State is not a "person" within the meaning of § 1983.  State Mem. at 25–28.  Finally, both Defendants argue that the suit is barred based on the statute of limitations.

On August 4, 2021, the Court held oral argument on Defendants' motions to dismiss, ECF No. 27, took the motions under advisement, and directed the parties to submit supplemental briefing addressing the effect on this case of the Supreme Court's decision in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019).  ECF No. 28.

The Court begins by engaging with *Knick*.

In *Knick*, decided in 2019, the Supreme Court overturned a critical aspect of the ripeness requirement for bringing constitutional takings claims in federal court—often referred to as the "state-litigation requirement"— established in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985).  The *Williamson County* court had explained that because the Constitution does not require "pretaking compensation," events giving rise to a taking claim are not "complete" until the state fails to provide compensation.  473 U.S. at 195.  Thus, under *Williamson County*, takings claims in federal court were deemed not ripe until plaintiffs had been denied compensation in state proceedings.  *Knick*, 139 S. Ct. at 2169.

This state-litigation requirement, however, led to a Catch-22 situation for plaintiffs.  They were effectively forced to litigate their federal takings claims, if at all, in state court because such claims would not be ripe in federal court until a state court had denied compensation.  However, once ripe, any attempt to litigate a federal takings claim in federal court would be barred by the claim preclusion principles of res judicata.  For example, in *San Remo Hotel, L.P. v. City and County of San Francisco,* 545 U.S. 323 (2005), the plaintiff hotel complied with the then extant prerequisite state-litigation requirement and sought compensation in state court, expressly reserving a takings claim under the Fifth Amendment for subsequent federal court litigation.  But

the Supreme Court, oblivious to the dilemma posed by *Williamson County*, found that the plaintiff's loss on the takings claim in state court had a preclusive effect on the federal court, which meant that any Fifth Amendment claim in federal court was barred. *San Remo Hotel*, 545 U.S. at 346–47. *Knick* sought to resolve the dilemma.

In *Knick*, the Supreme Court recognized that the *Williamson County* state-litigation rule was "unworkable in practice" because it effectively barred property owners from vindicating their federal constitutional rights in federal court. 139 S. Ct. at 2178. Accordingly, *Knick* expressly overruled the *Williamson County* rule and held that property owners could bring Fifth Amendment takings claims directly in federal court as soon as property was taken without just compensation by a local government. *Id.* at 2179. [12]

This history has important implications for the case at bar. Against this background, the Court considers the County's Motion to Dismiss or in the Alternative for Summary Judgment, ECF No. 16 and the State's Motion to Dismiss, ECF No. 17.

## II.     STANDARD OF REVIEW

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). The challenge under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the

---

[12] When the Supreme Court announces a new rule of civil law, the rule applies retroactively to similarly situated litigants. *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 534 (1991). Several courts have found that the holding in *Knick* qualifies as a new rule of civil law and should be applied retroactively. *See, e.g., Honchariw v. Cty. of Stanislaus*, 530 F. Supp. 3d 939, n. 9 (E.D. Cal. 2021), *aff'd* No.21-15801, 2022 WL 522287 (9th Cir. Feb. 22, 2022); *4th Leaf LLC v. City of Grayson*, 425 F. Supp. 3d 810, n. 9 (E.D. Ky. 2019).

complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). With respect to a facial challenge, a court will grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799. When addressing a facial challenge, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns*, 585 F.3d at 192 (*quoting Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982)).

### B.  Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although a district court must accept as true all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor, that tenant "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### C.  Summary Judgment Under Rule 12(d)

The County's Motion is styled as a motion to dismiss, or in the alternative for summary judgment. Under Federal Rule of Civil Procedure 12(d), if "matters outside the pleadings are presented to and not excluded by the Court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be a given a reasonable opportunity to present

all the material that is pertinent to the motion." Ordinarily, summary judgment "is not appropriate where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir. 2011) (citing *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985) (quotation omitted).

The district court may exercise its discretion to convert a motion under Rule 12(b)(6) into a motion for summary judgment. *See Sager v. Hous. Comm'n of Anne Arundel Cty.*, 855 F. Supp. 2d 524, 542 (D. Md. 2012) ("a district judge has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'") (quoting Charles Alan Wright et al., § 1366 Conversion of a Rule 12(b)(6) Motion into a Summary Judgment Motion, 5C *Fed. Prac. & Proc. Civ.* § 1366 (3d ed. 2004, 2011 Supp.)). Because the district court need not consider matters outside the pleadings in resolving the pending motions, this Court will exercise its discretion and not convert the County's motion into a motion for summary judgment and will treat it as a motion to dismiss under Rules 12(b)(1) and 12(b)(6). Therefore, the County's alternative Motion for Summary Judgment is **MOOT**. The County, of course, may move for summary judgment at a later stage in the proceedings.

### III.    DISCUSSION

Defendants' two motions assert a total of six grounds which they argue should lead the Court to dismiss the Complaint: (1) lack of a subject-matter jurisdiction; (2) res judicata,

(3) *Rooker-Feldman* abstention, (4) sovereign immunity,[13] (5) failure to state a claim, and (6) statute of limitations.  The Court reckons with these arguments.[14]

### A. Federal Question Jurisdiction

As a threshold matter, Defendants argue that the Court lacks subject matter jurisdiction because the Complaint raises no substantial federal question.  *See* Cty. Mem. at 9–11; State Mem. at 29–30.

The federal-question jurisdiction statute confers on the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  A case arises under federal law if the complaint "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006).  *See also Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("federal question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction only exists when a federal question is presented on the face of the plaintiff's properly pleaded complaint") (internal citations omitted).

Defendants assert that, although Plaintiffs invoke federal law, no federal law is essential to the case because Plaintiffs' claims against them are "based entirely upon contractual rights allegedly formed in 1957." Cty. Mem. at 10–11; State Mem. at 29.  Any constitutional issues that might arise in defense of the contract claims, they say, are insufficient to confer jurisdiction.  State Mem. at 30.  Plaintiffs contend that, in addition to the federal question recognized in *Knick*

---

[13] Only the State relies on sovereign immunity as a defense.  The County does not assert the defense.

[14] The Court deals with Defendants' arguments in slightly different sequence than as presented by them.

establishing the right to bring a Takings Clause case in federal court, as just discussed, they have also plead violations of the Fifth and Fourteenth Amendments to the Constitution,[15] as well as violations of their rights under the Contracts Clause of the Constitution, pursuant to 42 U.S.C. § 1983.

The Court finds that the Complaint fairly states claims for violations of federal law. Again, there is the federal right under the Takings Clause as recognized in *Knick*. Plaintiffs say they have been deprived of their property without just compensation. To be sure, a contract may have been involved, but the parties are focused on only one aspect of the asserted "breach"—that is, whether Defendants breached the 1957 contracts by not allowing the construction of piers or their monetary value. But unquestionably the 1957 contracts also embodied a taking of property by the State; indeed, because the State offered a quid pro quo for the rights of way (i.e., you can build piers), the State was arguably acknowledging the taking. The right to build the piers, it was assumed, was the just compensation being given in exchange for the taking.

But, as the Court now explains, what eventually happened—at least it is fairly arguable at this point—is that ultimately there was either a failure of consideration; Defendants deliberately or otherwise did not produce what they promised to produce, i.e., the pier rights; and/or the parties were mutually mistaken as to the State's ability to promise the pier rights; and/or there was a frustration of purpose caused by Defendants, who continuously blocked Plaintiffs from ever receiving their end of the bargain i.e. the pier rights; and/or because it became impossible or impractical for the State and County to deliver on the State's promised pier rights since, as the CSA ultimately held, Plaintiffs had no vested pier rights in the first place and in any case because

---

[15] Plaintiffs' claims for denial of substantive due process and equal protection of the law are framed, as they should be, as actions pursuant to 42 U.S.C. § 1983.

the County could not legally bargain away its zoning authority.[16]  Reading the Complaint in this way, the jugular inquiry would be whether Plaintiffs are entitled to restitution inasmuch as they performed their end of the bargain by granting the rights of way but Defendants would not or could not perform their end and allow construction of the piers.

However Plaintiffs' theories may be denominated—as a straight breach of contract, quasi-contract, failed contract, or sui generis,[17] —the point is that this is not the same relief Plaintiffs sought in the prior state litigation. Among other things, the present litigation introduces the likelihood of a different base date for Defendants' nonfulfillment of the 1957 contracts – i.e., March 2020, when the Maryland Court of Appeals denied certiorari with respect to the CSA's 2019 decision because that is the date that Defendants' promised consideration (to allow the piers to be built) was deemed to have failed, and/or it was the date on which the parties learned of their initial mutual mistake as to ability of Defendant to promise them consideration and/or the date when all parties first learned that it was legally impossible or impractical for Defendants to deliver on the consideration they promised in the 1957 contracts because Plaintiffs had no vested rights in the piers and the County could not bargain away its zoning authority.

But, if no contract was ever formed or if no contract could ever be performed (leaving aside the extent to which Defendants may have frustrated Plaintiffs' right to obtain the benefit of the

---

[16] The Court will not burden the text with extensive citation of authorities as to these theories. Instead, Appendix B hereto sets forth several relevant citations.

[17] While "restitution has long been available as a remedy for breach of contract, it retains much of its character as a basis of recovery independent of contract.  Accordingly, courts sometimes speak of restitutionary recovery as 'off the contract,' as opposed to expectation damages 'on the contract,' and otherwise frame their opinions in terms suggesting that the contract cases to govern the rights of the parties when a restitutionary remedy is properly invoked."  Eric G. Andersen, *The Restoration Interest and Damages for Breach of Contract*, 53 Md. Law. R. 1, 15 (1994). *See, e.g., United States ex rel. Coastal Steel Erectors v. Algernon Blair*, 479 F.2d 638, 641 (4th Cir. 1973) (distinguishing a claim in *quantum meruit* from recovery "on the contract").

consideration Defendants promised), the same would be true with respect to the date of the taking without just compensation. If Defendants are deemed to have taken Plaintiffs' rights of way in 1957, promising "just compensation" in the form of pier rights, then withdrew or were compelled to withdraw the "just compensation" component as of 2020, then 2020 would arguably be the date of the taking without just compensation.

In short, this is by no means the replay of a simple contract case. Plaintiffs' takings claim is very much in play, as are their claims of violations of the substantive due process and equal protection clause (described more fully *infra*). The Court is confident it has jurisdiction to entertain this suit.[18]

## B. Res Judicata

In their Motions to Dismiss and supplemental briefs, Defendants argue that the case is barred by res judicata because there was a final judgment on the merits on essentially identical claims are between identical parties in Maryland state court.  *See* Fed. R. Civ. P. 8(c)(1).

Under the doctrine of res judicata, specifically claim preclusion (as opposed to issue preclusion), a party is barred from relitigating a claim that was decided or could have been decided in a prior action.  *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016) (internal citations and quotations omitted).  Federal courts apply res judicata when a matter is raised in federal court following a final state court decision on the same issue

---

[18] Having found that Plaintiffs have properly alleged federal question jurisdiction, Plaintiffs' state contract claim is properly before the Court on the basis of supplemental jurisdiction.  28 U.S.C. § 1367.  Interestingly, pre-*Knick*, the Fourth Circuit advised that, when dealing with claims for breach of contract and unconstitutional taking, the better course for the district court is to hold the takings claim in abeyance pending resolution of the contract claim. *Cherry v. Mayor & City Council of Baltimore City*, 762 F.3d 366, 374 n.6 (4th Cir. 2014) ("[T]he district court may wish to hold any proceedings regarding the Takings Clause claim in abeyance pending the resolution of related contractual issues.").

between the same parties.  *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 84–85 (1984) (Blackmun, J., for the majority).

For res judicata to bar a later action, three elements must be satisfied: (1) there was a final judgment on the merits in the earlier suit; (2) the claim presented in the current action is identical to the one determined in the prior adjudication; and (3) the parties in the present litigation are the same or in privity with the parties in the earlier dispute. *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008).  For the reasons that follow, the Court finds that res judicata does not bar Plaintiffs' case.

First of all, there is obviously no complete identity as between plaintiffs in the *Donnelly I & Donnelly II* state cases, on the one hand, and all Plaintiffs in the current litigation. Only Plaintiffs Donnelly; DiGiovanni's Dock of the Bay, Inc.; and Prime Island Properties, LLC were parties to the state cases whereas Plaintiffs Conner, LLC; Solomons Island Yacht Club, Inc.; and Christopher J. Moore were not.  Accordingly, as to these three more recent Plaintiffs, no res judicata argument stands in their way.  They are in no sense bound by the prior litigation and can proceed free and clear of res judicata concerns in the present case, assuming they can overcome all the other hurdles Defendants raise.

Even as to the Plaintiffs who were parties to the state litigation, though for slightly different reasons, they are in no way impeded by res judicata from going forward because, even assuming there is an identity of parties as between them and Defendants, there is no identity of issues nor was there any final judgment.

Defendants misapprehend what this case is really about. While Plaintiffs, to be sure, spend a considerable amount of time alluding to their supposed right to construct piers, another way to read their Complaint is that, for one reason or another, they have been deprived of the benefit of

their 1957 bargain. They gave up portions of their real property when they granted rights of way to the State and in exchange got, not money, but a promise from the State that they could build piers. Over time, Defendants either acted to frustrate Plaintiffs as they attempted to act on Defendants' promise by denying Plaintiffs' requests to build piers or both Plaintiffs and Defendants were mutually mistaken that what Defendants had promised could be delivered (based on the CSA ruling that Plaintiffs had no vested right to build piers because their riparian rights were unvested and because the County could not bargain away its zoning authority).  But Plaintiffs, in granting the rights of way, had bestowed a benefit upon Defendants. In sum, there clearly appears to have been a failure of consideration on the part of Defendants.  As such, what Plaintiffs were left with—at least arguably—was/is entitlement to some measure of restitution of the benefits they bestowed.

The point is that this view of the case, although contract-related, is distinctly different from what was before the state courts. What makes the point most forcefully is that the occurrence of the apparent mutual mistake of fact/frustration of purpose/impossibility or impracticality of performance/failure of consideration was not identified until March 2020 when the Maryland Court of Appeals let stand the CSA decision of 2019 that Plaintiffs ultimately had no vested right to build piers in the first place and that the County could not bargain away its zoning authority, another way perhaps of saying that Defendant had made what was in effect an illusory promise. Thus, not only are the contract-related issues before the Court at present not identical to the contract-related issues in the state litigation; most certainly there never was final judgment as to the contract-related issues now before this Court.

There is an easy answer to Defendants' argument that the takings and contract claims could have been raised in state court, which they believe would satisfy the second element for res judicata to apply. *See* State Mem. at 16–18 (citing *Laurel*, 519 F.3d at 162).

As the Court has just observed, arguably the takings claim did not even ripen until the Maryland Court of Appeals in March 2020 denied certiorari in *Donnelly II*, letting stand the CSA declaration, for the first time, that Plaintiffs had no right to compensation, much less "just" compensation for the denial of pier rights Defendants promised. But whether or not the pier rights were deemed compensable, what the state courts did not address and what is very much in issue before this Court is the question of what measure of restitution Plaintiffs might be entitled to for their performance of the 1957 contracts, i.e., for ceding the rights of way over their land, when Defendants' promise, for one or more of the reasons suggested above, was never delivered and ultimately, it appears, was never even deliverable.

There is, of course, an additional answer to Defendants' argument that Plaintiffs could have asserted a takings claim in the state litigation.

As discussed *supra*, prior to the Supreme Court's decision in *Knick*, *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) was the controlling authority. Under *Williamson County,* federal takings claims were not ripe until property owners had been deprived of just compensation under state law in state court. But, as the Supreme Court recognized in *Knick*, the *Williamson County* state-litigation requirement prevented plaintiffs from pursuing their federal takings claims in federal court because, as a practical matter, an adverse state court decision—which supposedly was necessary to make the takings claim ripe in federal court—effectively precluded a federal court from considering it. 139 S. Ct. at 2169. In overruling the state-litigation requirement of *Williamson County*, the Supreme Court in *Knick*

sensibly held that a property owner may bring a Fifth Amendment takings claim under 42 U.S.C. § 1983 "when the government takes his property without paying for it." *Id.* at 2167, 2177.  That, in the Court's view, is the critical issue.

As the Court sees it, the issue is not whether Plaintiffs could have or should have brought a takings claim in state court.  The issue is whether Plaintiffs should be able to proceed in this Court today, when, by reason of *Williamson County*, they were effectively deprived their right to bring their claim directly in federal court, arguably a more favorable forum in which to litigate than before a local government agency or state court, especially where the very adversaries in the underlying dispute are local and state governmental agencies.  When Justice Blackmun wrote in *Migra* that federal courts are obliged to apply res judicata principles to state court decisions, he noted—crucially—that in the case before his court "petitioner could have obtained a federal forum for her federal claim by litigating it first in a federal court."  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 84–85 (1984) (holding that petitioner's state-court judgment had a preclusive effect in federal court because she could have brought her federal claim in federal court).  But that was definitely <u>not</u> true here.  As a practical matter, by virtue of *Williamson County*, Plaintiffs could <u>not</u> have brought a federal takings claim in federal court.  All this is another way of saying that the issues before the Court now—assuming all of Defendants' other challenges are surmounted—are not identical with those raised or which could have been raised in the state court litigation.  The Court finds that the second element for the application of res judicata—identity of issues—has not been satisfied.  Nor of course, to repeat, was there ever any final judgment as to these issues.

The Court **DENIES** Defendants' Motions to Dismiss Count V, the breach of contract claim.

**C.  *Rooker-Feldman* Abstention**

Defendants argue that the *Rooker-Feldman* doctrine bars this Court from sitting in appellate review of decisions of the Maryland state courts.  *Rooker-Feldman* prevents a district court from entertaining suits by "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283–84 (2005).  Although the doctrine bars plaintiffs from seeking lower federal court review of state-court decisions, courts have cautioned that it is a doctrine of limited application.  *Id.* at 283.  *See also Stratton v. Mecklenburg Cty. Dep't of Soc. Servs.*, 521 F. App'x 278 (4th Cir. 2013) (noting that the *Rooker-Feldman* doctrine is "rarely relied upon in the federal courts"); *Thana v. Bd. of License Comm'rs for Charles Cty., Md.*, 827 F.3d 314, 320 (4th Cir. 2016) ("the Supreme Court has noted repeatedly that, since the decisions in *Rooker* and *Feldman*, it has never applied the doctrine to deprive a district court of subject matter jurisdiction").

The Fourth Circuit has explained that the *Rooker-Feldman* doctrine "assesses only whether the process for appealing a state court judgment to the Supreme Court . . . has been sidetracked by an action filed in district court <u>specifically</u> to review that state court judgment."  *Thana*, 827 F.3d at 320 (emphasis in original) (internal citations and quotations omitted).  Thus, if a plaintiff in federal court does not seek review of the state court judgment itself but instead presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.  *Id.*  In *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006), the Fourth Circuit determined that the *Rooker-Feldman* doctrine did not bar a plaintiff's lawsuit when the plaintiff lost before a Virginia state court and then filed a suit in federal district court raising similar claims to those he raised in the

state proceedings because in the federal complaint the plaintiff did not allege that the state court decision itself caused him injury. *Id.* at 719 (citing *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77 (2d Cir. 2005) ("The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker–Feldman*, of the state-court judgment.").

Defendants characterize Plaintiffs' case as seeking to invalidate the decisions of the CSA. *See* Cty. Mem. at 13–14; State Mem. at 26.  Indeed, in their Opposition, even Plaintiffs, far too charitably it seems, ask this Court "to undo the decision of the Court of Special Appeals, namely, to award the Plaintiffs compensation for the taking of their property rights and to include compensation for the numerous violations of the contract agreements[.]" Opp'n to State Mot. to Dismiss at 23.  But notwithstanding this rather careless use of language by Plaintiffs, it certainly cannot be said that, by it, they intend to totally give away the store.  An alternative reading of the Complaint suggests that Plaintiffs do not really seek redress "for an injury caused by the state-court decision itself" but rather for injuries caused by the Defendants' alleged taking of their property rights, i.e., rights of way, without providing just compensation.

Consistent with this narrow construction of the *Rooker-Feldman* doctrine, the Court concludes that the present suit is an independent action even though the Complaint includes claims and arguments similar to those made in the state proceedings.  While success on the claims in the present case might well indirectly reflect upon certain aspects of the state court decisions, this case cannot be deemed "specifically to review the state court judgment."  *See Exxon*, 544 U.S. at 284. The Court holds that Plaintiffs' federal claims are not barred by *Rooker-Feldman*.

#### D.   Sovereign Immunity

The State also argues that the Court must dismiss all claims against it on the basis of sovereign immunity.  As things stand, the Court is inclined to agree.  It is not a question of whether the State may or may not have breached its contract with Plaintiffs or whether it engaged in an unconstitutional taking.  It is a matter of the constitutional immunity of states in federal court.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  State sovereign immunity is "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the [Constitutional] Convention or certain constitutional amendments." *Alden v. Maine*, 527 U.S. 706, 713 (1999).

In the Fourth Circuit, state sovereign immunity applies to takings claims so long as the state (1) has not waived its sovereign immunity and (2) provides an open forum to adjudicate such a takings claim.  *Hutto v. S.C.  Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014).  The State submits that this rule remains in place after *Knick*.  The Court understands this.

Recently, in *Zito v. North Carolina Costal Resources Commission*, the Fourth Circuit joined other circuits finding that *Knick* did not abrogate state sovereign immunity for takings claims.  8 F.4th 281 (4th Cir. 2021).  In *Zito*, the plaintiffs argued that *Knick* "indirectly altered the sovereign immunity framework by recognizing the self-executing nature of the Takings Clause." *Id.* at 287.  The Fourth Circuit disagreed, noting that *Knick* did not address sovereign immunity and that the Supreme Court recognized the self-executing nature of the Takings Clause prior to *Knick*.  *Id.   See also Williams v. Utah Dep't of Corr.*, 928  F.3d  1209,  1214  (10th  Cir.

2019) (holding that state sovereign immunity applies to takings claims post-*Knick*); *Bay Point Properties, Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019) (same), *cert. denied*, 140 S. Ct. 2566 (2020); *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020) (same), *cert. denied*, 141 S. Ct. 1390 (2021).   The *Zito* court further reasoned that *Knick* "restored takings claims" to the same status as other constitutional claims, suggesting that takings claims remain subject to the same limitations as other constitutional claims, including sovereign immunity.   *Zito*, 8 F.4th at 287–88.

The Court agrees that the Eleventh Amendment bars suits against it *qua* State in federal court.   That is true, certainly insofar as the State is not a "person" within the meaning of 42 U.S.C. § 1983, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989): However, there is always the possibility (overlooked by Plaintiffs here) that the State might ultimately be held to account if a state official were sued in his or her <u>individual</u> capacity as opposed to official capacity.   *See Hafer v. Melo*, 502 U.S. 21 (1991) (allowing individual capacity suit against state government officer).   *See, e.g., Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687–88 (1949) (noting that sovereign immunity does not always bar suits against government officials in their individual capacities); *Ex parte Young*, 209 U.S. 123, 159–60 (1908) (Eleventh Amendment does not bar suits against state officers to enjoin violations of federal law).

By that fiction, a "person" would be placed in the dock and actions taken on behalf of the State, fictively speaking through the individual, might be brought to book.   Here, the State has been sued for at least three constitutional violations—a taking without just compensation, denial of substantive due process and denial of equal protection.   No sovereign immunity would be applicable as to those claims as to state officials sued in their individual capacities.   *Hafer*, 502 U.S. at 30.   Arguably, whether or not the State could be made to pay damages by reason of actions

taken by of the state official in his or her individual capacity, *see Ford Motor Co. v. Department of the Treasury*, 323 U.S. 459, 464 (1945), the State might still be enjoined from taking action in the future, *see Edelman v. Jordan*, 415 U.S. 651 (1974), which here might mean that the State could be enjoined from taking any action that would undercut any award of money damages the County might be ordered to pay.  *See Lewis v. Clarke*, 137 S. Ct. 1285, 1290–91 (2017) ("in the context of lawsuits against state and federal employees or entities, courts should look to whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit"). For now, pending possible further action by Plaintiffs, [19] the Court will **DEFER** ruling on the State's Motion to Dismiss based on sovereign immunity.

### E.  Failure to State a Claim

#### 1.  Takings and Substantive Due Process Claims

Defendants argue that Plaintiffs' takings and inverse condemnation claims (Counts I and II) and substantive due process claim (Count III)—brought under the Fifth and Fourteenth Amendments—fail as a matter of law because Plaintiffs do not have a protected property interest. Plaintiffs disagree, asserting that their contractual rights under the 1957 option contracts reflect property interests they cannot be deprived of without just compensation.

---

[19] Plaintiffs will be given leave to request to add an appropriate state official in his or her <u>individual</u> capacity, such as the Head of the State Highway Administration as successor in interest to the Head of the State Roads Commission which made the 1957 contract or perhaps the Governor or some other appropriate official. Plaintiffs should file their motion to add such individual as Party Defendant within 30 days. Defendant may respond in 20 days thereafter and Plaintiffs may reply within 10 days after that.  As the Fourth Circuit has urged innumerable times, it is always preferable that a case be heard on its merits.  *See, e.g., United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993).

The Takings Clause of the Fifth Amendment forbids the taking of private property "for public use, without just compensation." U.S. Const. amend. V. [20]  The Fourteenth Amendment prohibits any State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1.  Thus, to survive a motion to dismiss with respect to Counts I, II and III, Plaintiffs must plausibly allege that they hold protected property interests.  Property interests are not created by the Constitution but rather by "existing rules or understandings that stem from an independent source such as state law."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  Further, to have a property interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."  *Id.  See also Student "A" v. Hogan*, 513 F. Supp. 3d 638, 646 (D. Md. 2021) ("a contract may create a constitutionally protected property right if the contract creates an entitlement and if the right is a type accorded protection under the due process clause.") (internal citations and quotation marks omitted).

The County argues that Plaintiffs have no vested property rights in the piers and thus have no cognizable property interest.  Cty. Mem. at 20.  The State submits that the SRC, "[r]ather than intiat[ing] condemnation proceedings," "entered into option contracts with each property owner." State Mem. at 6.  Through these option contracts, the SRC reserved to property owners certain riparian rights—"the right to construct, maintain or repair any pier structure they may desire to erect outside the proposed bulkhead to be built."  *Id.*  Therefore, according to Defendants, Plaintiffs at most hold only contractual rights.  While focusing—perhaps too much—on their property interest in potential piers, Plaintiffs also suggest that the rights of way they gave in exchange for

---

[20] The Fifth Amendment applies to the states through the Fourteenth Amendment.  *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 122 (1978).

the right to construct piers in the first place are property interests they cannot be deprived of without just compensation.

The Court finds that Plaintiffs have the better part of this argument.

The reframing is important. When the focus is upon on the rights of way that Plaintiffs gave up to allow the bulkhead to be built, Plaintiffs' property interests stand in bold relief. Given the 1957 contracts, Plaintiffs submit that they hold "more than a unilateral expectation" of their rights; they hold "legitimate claims of entitlement" to their alleged rights. *See Roth*, 408 U.S. at 577. *See also Frall Devs., Inc. v. Bd. of Cty. Comm'rs for Frederick Cty.*, No. CV WDQ-07-1630, 2007 WL 9717687, at *7 (D. Md. Nov. 20, 2007) ("Plaintiffs in the present case have sufficiently alleged that their contractual rights are bound up with traditional property rights to state a constitutionally protected interest."). The Court believes Plaintiffs are correct in this.

### a.   The Takings Claims in Particular (Counts I and II)[21]

The Supreme Court has determined that, "while property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking." *Murr v. Wisconsin*, 137 S.Ct. 1933, 1942 (2017) (quoting *Pa. Coal. v. Mahon*, 260 U.S. 393, 415 (1922)). The Court has recognized three primary categories of takings: 1) physical takings; 2) per se takings; and 3) takings that deprive a property owner of some—but not all—the uses or value of the property. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 320–22 (2002).

A per se taking occurs where the government "requires an owner to suffer a permanent physical invasion of [its] property" or "'completely deprive[s] an owner of *all* economically beneficial us[e]' of [its] property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). To

---

[21] Count I states a takings claim against the County; Count II states a takings claim against the State.

state a takings claim based on complete deprivation of all economic use, the challenging property owner must show that the land use regulation permits no economically beneficial use. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992).

In this case, Plaintiffs allege that Defendants' actions "have had the effect of regulating the pier rights into a state of economic inutility, thereby leaving plaintiffs with no reasonable use of their property, and inversely acquiring the same as open space." Compl. ¶ 38. Once again, the State suggests that the SRC, "[r]ather than intiat[ing] condemnation proceedings," "entered into option contracts with each property owner." State Mem. at 6. Through these option contracts, says the State, the SRC reserved to property owners certain riparian rights— "the right to construct, maintain or repair any pier structure they may desire to erect outside the proposed bulkhead to be built." *Id.* Citing the 2019 CSA decision, the State argues that the County's denial of Donnelly's pier application "merely prevented Donnelly from exercising his pier right in a particular matter," whereas the County did not "alter or extinguish his pier right." [22] *Id*. at 15. Defendants further argue that, under Maryland law, "ordinary riparian rights" are "extinguishable by the State and County at will" if the riparian right is not vested. *See Bd. of Pub. Works v. Larmar Corp.*, 262 Md. 24, 50 (1971)).

Once again, the parties are focusing on the wrong property interests.

Whether denial of an "unvested" riparian right is not a taking for which compensation is owed, *see Harbor Island Marina, Inc. v. Board of County Commissioners of Calvert County, Maryland*, 286 Md. 303, 319 (1979), what Plaintiffs are fundamentally asserting here is not a lack of compensation for unexercised riparian rights. In the 1957 contracts, Plaintiffs were induced to

---

[22] What the State means by this intended distinction is not entirely clear, though the language continues to imply that the consideration promised by the State in 1957 was in some way still viable.

grant rights of way to the State in exchange for the right to construct piers. They were given no compensation beyond that right, only the right to build piers. Presumably this was meant to be "just compensation." Yet for decades (1957 to 2012), based on the County's moratoria and its continuous denials of Plaintiffs' pier applications, Defendants unilaterally blocked Plaintiffs' efforts to exercise their right to construct piers. Then, as of the CSA's decision in 2019 (and denial of certiorari by the Maryland Court of Appeals in 2020), Plaintiffs were essentially told they had no right to construct piers after all, which is to say their so-called "rights" to build piers were left in a "state of economic inutility." As the Court has suggested, one can read this cri de cœur as in effect an alternative claim of failure of consideration, mutual mistake of fact, frustration of purpose, or impossibility or impracticality of performance. Applying one or more of these doctrines to the facts of the case, the true focus ought to be upon what restitution might be due Plaintiffs.

In 1957, the State took the rights of way and in exchange made promises it would not or arguably could not fulfill. But throughout, the County, as successor in interest to the State, has continued to hold onto the rights of way and benefitted from them, initially promising just compensation but eventually no compensation at all. So at some point—at least arguably—there was a "taking" and at another point, decades later, there was "no just compensation." As the Court sees it, it is entirely fair and reasonable to conclude that those two components—the taking and the lack of just compensation—only came together in March 2020, when the Maryland Court of Appeals denied certiorari in *Donnelly II*. In any event, precisely when the taking in fact is deemed to have occurred and what just compensation is due are inquiries that remain to be explored in this litigation.

The County's Motion to Dismiss Count I is therefore **DENIED**.  The State's Motion to Dismiss Count II is **DEFERRED**.

> b.   *Substantive Due Process Claim in Particular (Count III)*

To state a violation of substantive due process under the Fourteenth Amendment based on a property interest, plaintiffs must allege that "(1) [they] had property or a property interest; (2) the state deprived [them] of this property or property interest; and (3) the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty, Md.*, 862 F.3d 433, 443 (4th Cir. 2017) (emphasis in original) (quoting *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 827 (4th Cir. 1995)).  The Court finds that Plaintiffs have plausibly alleged all three elements.

As discussed above, Plaintiffs have satisfied the first element, viz. that they hold a property interest.  They owned the land that they ceded rights of way over and got a promise in exchange, the right to build piers, that turned out to be—it is not too harsh a word—a phantasm.  The second and third elements of a due process claim based on a property interest are also sufficiently pleaded. Plaintiffs assert that through the pier construction moratoria and subsequent denials of their pier applications, Defendants deprived them, deliberately or otherwise, of their property interest in the piers, i.e., frustrated their promised entitlement, all the while benefitting from the rights of way Plaintiffs gave them, but withholding the "just compensation" they had been promised.  Plaintiffs also submit that Defendants' actions were "improperly motivated and conscience shocking," taken under the guise of an environmental study of extensive duration.  The State submits that it enjoys broad authority and discretion over pier rights and that it had and has a legitimate government interest in governing activities in the State-owned submerged land.  State Mem. at 33, fn. 7.  That might be so.  But while environmental concerns may be deemed to have been a rational reason to

continuously deny Plaintiffs the right to construct piers, it is equally true that in simultaneously enjoying the rights of way Plaintiffs gave without receiving compensation, what Defendants did can fairly be seen as a deprivation of property "far beyond the outer limits of legitimate governmental action."   The bona fides of the County's moratoria, its continuous denial of Plaintiffs' pier applications, and its apparent total failure to even consider alternate compensation to Plaintiffs for the rights of way and the bulkhead are all appropriate matters to consider as the case develops.[23]

Taking all the facts in the Complaint as true, as befits a motion to dismiss, the Court finds that Plaintiffs have plausibly stated a substantive due process claim.   The County's Motion to Dismiss Count III is **DENIED**.   Ruling on the State's Motion to Dismiss Count III is **DEFERRED**.[24]

### 2.  Equal Protection Claim

In Count IV, Plaintiffs claim that Defendants' actions were "discriminatory, arbitrary, capricious, unreasonable, malicious, improperly motivated and conscience-shocking," resulting in a violation of the Equal Protection Clause of the Fourteenth Amendment based on disparate treatment. Plaintiffs allege that the County has treated "other proximate and/or similarly situated properties" differently.   That is, the County and State allowed the construction of at least a few piers before the County moratoria and before its ultimate denial of any liability on its promise occurred.

---

[23] *See also* discussion of the implied covenant of good faith and fair dealing, *infra* Part III.E.5 of this Opinion.

[24] As indicated *supra* Note 19, Plaintiffs may seek to add an appropriate state official in his or her <u>individual</u> capacity, which may have an effect on the State's motion as to this Count.

The Equal Protection Clause requires state actors to treat similarly situated persons alike. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To survive a motion to dismiss as to a claim of violation of this clause, Plaintiffs must plead facts sufficient to demonstrate that they have been treated differently from others with whom they are similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. *See Borkowski v. Balt. Cty., Md.*, 414 F. Supp. 3d 788, 808 (4th Cir. 2019) (internal citations omitted). The Court thus considers whether the alleged disparity in treatment between Plaintiffs and other similarly situated landowners can be justified under the requisite level of scrutiny. *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

Heightened scrutiny applies if plaintiffs allege that they were deprived of a fundamental right or are members of a suspect classification; otherwise, the government action need only "bear a rational relation to some legitimate end." *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007) (internal citation omitted). The government will "inevitably differentiate in some fashion between people, so outside of certain suspect groups like race or national origin, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Quinn*, 862 F.3d at 444 (quotation marks omitted) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440, (1985)). A plaintiff challenging a non-suspect classification bears a "heavy burden of negating every conceivable basis which might reasonably support the challenged classification." *Van Der Linde Housing*, 507 F.3d at 293 (internal citation omitted). The government "need not actually articulate at any time the purpose or rationale supporting its classification." *Pulte Home Corp. v. Montgomery Cty., Md.*, 909 F.3d 685, 693 (4th

Cir. 2018) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

Here, Plaintiffs aver that some landowners of property along the Patuxent River were permitted to build piers before the County moratoria took place and before the flat-out prohibition of building the piers took place, but that Plaintiffs, when they sought permission to build piers, were blocked from doing so. Ultimately the County's decision to treat latter-day Plaintiffs differently may be deemed to have been rationally related to keeping the river shoreline less cluttered and unsightly. But discovery may also show that, at one point or another, the County deliberately sought to discriminate against Plaintiffs in order not to have to fulfill the promises made by the State to the landowners in 1957 in order to gain the rights of way and, in doing so, it may turn out that they have denied Plaintiffs equal protection of the law. The case is at the pleading stage. Defendants may ultimately prevail on this issue. For now, however, the equal protection claim will remain in the case. The County's Motion to Dismiss to Count IV is **DENIED**. Ruling on the State's Motion to Dismiss Count IV is **DEFERRED**. [25]

### 3.   Breach of Contract (Count V)

In Count V, Plaintiffs allege that the denial of their pier applications amounted to a breach of contract. Defendants argue that this claim fails because "the CSA stated expressly that the County's actions were proper." Both sides again appear to miss the point.

Under Maryland law, the elements of a breach of contract claim are (1) a contractual obligation, and (2) a material breach of that obligation. *Reed v. Bank of Am. Home Loans*, No. PJM 13-3265, 2016 WL 3218720, at *10 (D. Md. June 10, 2016) (citing *Cowan Sys., LLC v.*

---

[25] Again, as to the State, this may depend on the addition of an appropriate state official in his or her individual capacity, as indicated *supra* Note 24.

*Choctaw Transp., Inc.*, No. WDQ–11–CV–0367, 2011 WL 2791248, at *2 (D. Md. July 14, 2011)).

The parties spend much of their time embroiled in arguing over the alleged breach of contract. Plaintiffs say that Defendant failed to deliver on the undisputed promise to allow them to build piers, and want to be compensated for the piers they were not permitted to build. Defendants, along with the Maryland appellate courts, say, since Plaintiffs had no right to build piers, they can recover nothing at all, principally because whatever rights Plaintiffs supposedly held never vested.

But, as the Court has pointed out, the contractual dispute in this case can be reframed more consistent with conventional contract-related and restitution principles. The parties had contracts – the 1957 options agreements. Plaintiffs performed their part of the bargain by granting rights of way over their properties. The consideration promised by the State was that Plaintiffs could build piers. But, as things developed over the years, Defendants either blocked construction of the piers or finally, with the support of the state courts, said Plaintiffs could not legally enforce their claim for the monetary equivalent of the unconstructed piers because their riparian rights had not vested and because the County, in any event, could not bargain away its zoning authority.

But the Court returns to the overriding unalterable fact: Plaintiffs performed their part of the contract. They gave the State the rights of way over their property, but got no performance— no piers, no monetary equivalent—in return.

The case, then, is better understood as a failure of consideration and/or mutual mistake of fact and/or a frustration of purpose and/or one of legal impossibility of performance on the part of Defendants. By that view, based on traditional principles applicable to failed contracts, the result becomes the appropriate restitution due to Plaintiffs. All that is required, as the Court sees it, is a

focus not on the contract as it pertains to pier rights as such, but rather upon the underlying contract in which Defendants failed to honor their promise to give Plaintiffs the pier rights in the first place.

For this reason, Defendants' Motions to Dismiss Count V are **DENIED**.

### 4.  Impairment of Contract (Count VI)

Count VI is styled unconstitutional impairment of contracts in violation of the Contracts Clause of the United States Constitution.[26]   Plaintiffs claim that denial of their pier rights "unreasonably impaired, altered and extinguished the existing terms and the State's obligations under the individual contracts with the Plaintiffs in violation of the Contracts Clause of the Constitution of the United States."  Defendants argue that this claim fails because the Complaint fails to include facts that their actions resulted in damage or substantial impairment.  Further, they argue that the Complaint fails to allege that the County's policy was unreasonable or necessary to serve an important public purpose.

The Court holds in favor of Defendants on this count but for a reason different from what they put forth.  Where a litigant maintains "the right to recover damages for breach of contract, there is no impairment of contract under the Contract Clause." *Cherry v. Mayor & City Council of Balt. City*, 762 F.3d 366, 371 (4th Cir. 2014).  If the law at issue does not "prevent[] the plaintiffs from pursuing a state law breach of contract claim, nor shield[] the [Government] from its obligation to pay damages should it be found in breach of contract," there is no constitutional claim.  *Id.*  Because Plaintiffs had the right to seek recovery for breach of contract in state court and because, as this Court finds, they have a right to pursue state-based contract-related claims in

---

[26]  The Contracts Clause provides: "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."  U.S. Const. art. 1, § 10, cl 1.

this Court, they cannot bring a constitutional impairment of contract claim here. Defendants'
Motions to Dismiss Count VI are **GRANTED**.

### 5. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count VII)

Plaintiffs have also plead a count against both Defendants for Breach of the Implied
Covenant of Good Faith and Fair Dealing (Count VII). Defendants are correct, with an important
caveat – Maryland does not recognize a stand-alone cause of action of this nature. *Abt Assocs.,
Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000), *aff'd*, 9 F. App'x 172 (4th Cir.
2001) (internal citations omitted). However, Maryland does acknowledge that the concept of good
faith and fair dealing inheres in every cause of action for breach of contract. *See Swedish Civ.
Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 794 (D. Md. 2002). *See
also Magnetti v. Univ. of Maryland*, 171 Md. App. 279, 909 A.2d 1101, 1105 n.3 (2006), *aff'd,* 937
A.2d 219 (2007) ("Maryland does not recognize a separate cause of action for breach of the implied
covenant of good faith and fair dealing; the allegations making up such a claim should be pursued
under a plaintiff's breach of contract claim.").

*Williston on Contracts* is in accord:

> **Breach of duty of good faith dealings as barring contract impracticably
> defense.**
>
> A promisor may be at fault when it breaches its duty to deal in good faith with the
> other parties or known beneficiaries to a contract. A covenant of good faith is
> implied in all contracts . . . The covenant imposes on a party both the duty to refrain
> from rendering performance impossible, and to do everything that the contract
> presupposes should be done by a party to accomplish the contract's purpose."

30 *Williston on Contracts* § 77:11 (4th ed.) (footnote omitted).

Accordingly, insofar as a cause of action for breach of contract or failed contract is alleged
and is being permitted to go forward in this case, the concept of good faith and fair dealing will
inevitably play a part. That would certainly include consideration of whether the County and/or

State, over decades, at all relevant times, acted in good faith and dealt fairly with Plaintiffs in enticing them or their predecessors in interest to give up property rights (i.e. rights of way) to allow the State to build the bulkhead, then for years were blocked by Defendants from constructing the piers, only to be finally told (with the imprimatur of the CSA) that Plaintiffs never had the right to construct the piers in the first place because, as an unexecuted riparian right, it never vested and because in any event the County could never have bargained away its zoning rights. The end result, the County appears to assume, is that it gets to keep the rights of way ceded by Plaintiffs for which the State, as its predecessor, paid nothing.  But, again, the issues of mutual mistake, frustration of purpose, impossibility or impracticality of performance, and in the end failure of consideration, as well as the appropriateness of restitution of the value of the rights of way are all relevant matters to explore as the case develops.

Because the implied covenant of good faith and fair dealing inheres in every contract action, *Swedish Civil Aviation Administration*, 190 F. Supp. 2d at 794, and because Count V states a claim for breach of contract or failed contract, the concept of good faith and fair dealing remains relevant to Plaintiffs' breach of contract claim.  As a standalone cause of action, however, it is not viable.  With that important caveat, Defendants' Motions to Dismiss Count VII are **GRANTED**.

### F.  Statute of Limitations

Defendants claim that, even if all the allegations in the Complaint are true, they are barred by Maryland's three-year statute of limitations because the claims arise either from the County's zoning regulations in 2009 or its denial of Plaintiffs' application to build piers in 2012.  Since the present suit was filed in December 2020, Plaintiffs suggest that, either way, limitations ran before suit was filed.

Statute of limitations is an affirmative defense and should be considered at the motion to dismiss stage only if the complaint alleges sufficient facts to reach the merits of that affirmative defense. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

For claims arising under § 1983, federal courts borrow the statute of limitations from the analogous forum state law claim. *Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379, 388. In Maryland, the relevant statute of limitations for civil actions such as this case is three years. Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2014) (statute of limitations for civil actions generally); *Harford Cty. v. Md. Reclamation Assoc., Inc.*, 242 Md. App. 123, 213 A.3d 757 (Md. 2019) (applying the civil action statute of limitations to takings claims). Although state law determines the statute of limitations, federal law determines when a § 1983 claim accrues. *Owens*, 767 F.3d at 388-89. In a federal takings claim, the claim ripens, and the statute of limitations accrues when there has been a <u>final</u> decision by a government entity regarding the property in question. *Williamson Cty.*, 473 U.S. at 186–87; *Knick*, 139 S. Ct. at 2169 (noting that the "finality" requirement of *Williamson County* was not challenged in *Knick*). To demonstrate finality, a plaintiff needs to show that "there is no question . . . about how the regulations at issue apply to the property in question." *Pakdel v. City and Cty. of S.F.*, 141 S. Ct. 2226, 2230 (2021) (internal quotations omitted). Given the continuous denial of Plaintiffs' pier applications, even while arguing that Plaintiffs retained their pier rights, there is no question that Defendants' actions apply to Plaintiffs' property rights. What is at least debatable is when those actions became "final."

In other words, when did the statute of limitations begin to run?

In a breach of contract case, the statute of limitations accrues "when the contract is breached and when the breach was or should have been discovered." *Boyd v. Bowen*, 147 Md. App. 635, 806 A.2d 314, 333 (Md. Ct. Spec. App. 2002) (internal quotation omitted). The

County argues that, according to the Complaint, Defendants breached the contract with Plaintiffs, if at all, in either 2009, when the County Commissioners amended the Master Plan and Ordinance to prohibit the construction of any new commercial piers off the bulkhead, or at the latest on June 13, 2012, when it denied Plaintiffs' pier application. Cty. Mem. at 16.

Similarly, with respect to takings claims, the County argues that, if the taking occurred by reason of the County's actions, then the alleged taking occurred in either 2009 or 2012. *Id.* at 19.

In marked contrast, Plaintiffs argue that "…the date of accrual in an inverse condemnation taking "becomes apparent when it is apparent that the physical invasion has become permanent…or stabilized." *Litz v. Maryland Dep't of Env't*, 434 Md. 623, 652, 76 A.3d 1129 (2013). According to Plaintiffs, the taking of their rights was not "permanent or stabilized" until March 27, 2020, when the Maryland Court of Appeals denied their petition for a writ of certiorari in *Donnelly II*. Opp'n to Cty. at 18. Therefore, say Plaintiffs, the Complaint in the present case, which was filed in December 2020, was well within the three-year limitations period. The Court finds Plaintiffs' argument convincing.

This much is indisputably clear: As late as 2016 (the date of the trial in *Donnelly II*), the State actually managed to get itself removed from the case by arguing that as of 2016 then Plaintiffs still retained the right to construct piers as opposed to the right to obtain monetary relief against it. Even as of 2019, the CSA appeared to acknowledge that Plaintiffs retained their pier rights, but then, in the very same opinion, ended up embracing the view that Plaintiffs had no vested right to build the piers because the piers had never been actually built (overlooking the fact that the State and County had, for decades, denied Plaintiffs the opportunity to construct the piers), adding, in any event, that the County could never bargain away its zoning authority.

42

But it is certainly fair argument that the CSA, in its 2019 opinion, was in effect, reopening the issue of the taking in 1957, when the State obtained the rights of way and promised Plaintiffs compensation in the form of pier rights.  From all that appears, there had been a promise of just compensation in 1957, i.e., the pier rights, but as of 2019 and the CSA opinion, the pier rights were taken away and there would be no compensation to Plaintiffs of any kind, much less just compensation.  To remind, the Supreme Court observed in *Knick* the right to sue accrues "<u>when the government takes . . . property without just compensation</u>."  *Knick* at 2167, 2177 (emphasis added).  It is fair argument that, until the Maryland Court of Appeals let stand the CSA declaration that no compensation—much less just compensation—was "due" Plaintiffs with respect to the "taking" of the rights of way in 1957, Plaintiffs' right to sue had not accrued.

In focusing on pier rights and unvested riparian rights but not on the underlying the concession of the rights of way, the CSA never considered the extent to which in 2019 it was reopening the question of whether there had been a failure of consideration on Defendants' part in connection with the 1957 contracts, again based on mutual mistake of fact and/or frustration of purpose and/or impossibility or impracticality of performance.  Thus, it would be entirely plausible to conclude that Defendants' purported breach of contract or failure of contract and denial of just compensation (or restitution) to Plaintiffs, did not <u>finally</u> occur until the CSA decision issued on November 14, 2019, or better said until March 27, 2020, when the Maryland Court of Appeals denied certiorari in that case.  By this view, the present suit, filed in December 2020, would clearly satisfy limitations.

But there is more.  It is also fair argument that, insofar as an earlier date for the taking or breach of contract may be cited, the doctrine of equitable tolling could also come into play.

Under that doctrine, regardless of the date a claim began to accrue, courts may exercise discretion allow cases to proceed, despite the possible lapse of the applicable limitations period. *See Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000).

In actions under § 1983, state law applies to questions of equitable tolling unless state law is "inconsistent with the federal policy underlying § 1983." *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 484–85 (1980). Maryland courts apply equitable tolling to statutes of limitations where "(1) there [are] persuasive authority or persuasive policy considerations supporting the recognition of the tolling exception, and (2) recognizing the tolling exception is consistent with the generally recognized purposes for the enactment of statutes of limitations." *See Philip Morris USA, Inc. v. Christensen*, 394 Md. 227, 238, 905 A.2d 340 (Md. 2006), *abrogated on other grounds by Mummert v. Alizadeh*, 435 Md. 207, 77 A.3d 1049 (2013). The Court finds that both of these elements appear to be met at the pleading phase of the case.

Here, the County and State's actions unequivocally granting Plaintiffs the right to construct piers, but then, over decades, consistently blocking pier construction and engaging in protracted litigation to deprive Plaintiffs of the promised quid pro quo—all the while acknowledging that Plaintiffs had pier rights—could fairly implicate the doctrine of equitable tolling.

Moreover, when Plaintiffs' pier application was denied in 2012, *Williamson County*'s state-litigation requirement was still in effect; Plaintiffs did not, practically speaking, have an actionable takings claim to bring in federal court. *Knick*, 139 S. Ct. at 2167. Under *Williamson County*, the statute of limitations period could not commence until the conclusion of state litigation. However, at that point, a decision from the state court would have precluded plaintiffs from pursuing their federal takings claim in federal court. *See San Remo Hotel*, 139 S. Ct. 2162 (holding that state

court rulings on federal takings claims are preclusive in federal court).  Plaintiffs, as indicated, were clearly in the "Catch-22" situation described by the Supreme Court in *Knick*.

The Court finds that, the Supreme Court in *Knick*, in providing Plaintiffs with a previously unavailable federal forum to pursue their constitutional takings claim by the Supreme Court in *Knick*, found a "persuasive public policy" reason to toll the statute of limitations.  *See Philip Morris USA*, 394 Md. at 239–40.

The importance of access to federal court for <u>all</u> federal constitutional claims is evident in the history of § 1983 and the Supreme Court's interpretation of the statute. The statute's precursor, the Civil Rights Act of 1871, was enacted in recognition of the federal government's role in guaranteeing protections of the Constitution.  *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (noting that after the Civil Rights Act of 1871, the "role of the Federal Government as a guarantor of basic federal rights against state power was clearly established.").  In enacting the 1871 bill, Congress intended to "throw open the doors of the United States courts" to plaintiffs seeking redress for constitutional violations. *Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496, 504 (1982) (discussing the legislative history of the Civil Rights Act of 1871). The *Knick* Court paid deference to this history when it overruled *Williamson* and opened the doors of federal courts to claims previously relegated to state court. *Knick*, 139 S. Ct. at 2167.  The Supreme Court thus made clear that the enactment of § 1983 reflects a strong public policy of providing a federal forum for the vindication of a federal right.  That "public policy" further persuades the Court that the statute of limitations very much ought to be tolled in the present case.

Nor would tolling the usual three-year statute of limitations be inconsistent with the general purpose of statutes of limitations.  *Philip Morris USA*, 394 Md. at 239–40.  Maryland courts have recognized that the purpose of the civil action statute of limitations is to "provide adequate time

for a diligent plaintiff to bring suit as well as to ensure fairness to defendants by ensuring prompt filing of claims." *Fairfax Sav., F.S.B. v. Weinberg & Green*, 112 Md. App. 587, 685 A.2d 1189, 1201 (Md. Ct. Spec. App. 1996) (quoting *Hecht v. Resol. Tr. Corp.*, 333 Md. 324, 635 A.2d 394, 401 (Md. 1994)).

Tolling the statute of limitations in this case would in no sense reward Plaintiffs for a lack of diligence.  The three original state court Plaintiffs (Donnelly, DiGiovanni's Dock of the Bay, Inc., and Prime Island Properties, LLC) first filed their case in state court on August 22, 2012, less than three months after the County denied their last pier application.  Compl. ¶¶ 22, 24.  They doggedly pursued their claims in the years that followed, even as Defendants continued to acknowledge that Plaintiffs still had pier rights, while denying them the right to exercise them.  It was only when that the Maryland Court of Appeals denied a writ of certiorari in *Donnelly II* on March 27, 2020, that Defendants embraced the view of the state appellate court that Plaintiffs had no pier rights after all.

Moreover, tolling the statute of limitations would constitute no unfairness to Defendants. Plaintiffs are obviously not reviving stale claims unfamiliar to Defendants, who have continuously done battle with Plaintiffs in the state courts with respect to these issues since at least 2012, if not before.

Finally, because Plaintiffs lacked a meaningful right to bring their takings claims before this Court until after the *Knick* decision was announced on June 21, 2019—and because the date of the taking of Plaintiffs' property (i.e. the rights of way ) without just compensation may well be deemed to have in fact only accrued in 2020 when the Maryland Court of Appeals denied certiorari after the CSA for the first time held in 2019 that Plaintiffs had no vested interest in the construction of piers and no right to compensation for what Defendants had promised—it would not be

unreasonable to conclude that the statute of limitations only began to run as of to March 27, 2020. Plaintiffs filed their Complaint in this Court on December 17, 2020, less than nine months later. Accordingly, the Court finds that Plaintiffs' takings, contract-related, and constitutional claims may well be determined to have been filed within the statute of limitations.[27]

## IV.   CONCLUSION

For the foregoing reasons, the Court the Court **GRANTS IN PART, DENIES IN PART,** and **DEFERS IN PART** Defendants' Motions to Dismiss, as follows:

The Court **GRANTS** the Board of County Commissioners of Calvert County's Motion to Dismiss as to Counts VI and VII. The County's Motion is **DENIED** in all other respects.

The Court **GRANTS** the State of Maryland's Motion to Dismiss as to Counts VI and VII. The State's Motion is **DEFERRED** in all other respects.

Plaintiffs shall have thirty (30) days to seek to add as Parties Defendant either the Head of the State Highway Commission or the Governor, or some other appropriate official of Maryland in his or her individual capacity, consistent with the Court's observation in Note 19. Defendant State shall have twenty (20) days thereafter to oppose and Plaintiffs shall have ten (10) days thereafter to reply. A separate Order will **ISSUE.**

May __, 2022

_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

---

[27] At some point, either the Court or the jury will have to decide when the limitations period began to run. *See Litz v. Maryland Dep't of Env't,* 434 Md. 623, 641, 76 A.3d 1076 (2013) (internal citations and quotation marks omitted) ("The question of when a cause of action accrues is ordinarily left to judicial determination. The determination of when an action accrued may be based solely on law, solely on fact, or on a combination of law and fact. When it is necessary to make a factual determination to identify the date of accrual, however, those factual determinations are generally made by the trier of fact, and not decided by the court as a matter of law.")

**V. CHARLES DONNELLY,** *et al.* **v. STATE OF MARYLAND,** *et al.*
**Civil No. 20-3654-PJM**

## APPENDIX A

**Timeline**

**1957**: State Highway Administration ("SHA") pursues rights of way over numerous parcels of land abutting the Patuxent River on Solomons Island
- SHA enters into option contracts granting affected landowners the right "to construct, maintain or repair any pier structure they may desire outside the proposed bulkhead to be built by the Commission under this contract"

**February 1986**: Calvert County places temporary moratorium on construction of any piers

**June 10, 1986**: Calvert County adopts first "Solomons Master Plan and Zoning Ordinance"
- Master Plan proposes three methods for dealing with the pressure from the landowners to build piers and competing pressure from the Calvert County Department of Planning and Zoning to keep the shoreline free of piers for environmental and aesthetic reasons:
  (1) Allow holders of riparian rights along the Patuxent to build their own private commercial piers;
  (2) Limit commercial pier construction to a single pier, offer first rights of retail space on the pier to the holders of riparian rights, and financially compensate the affected holders of riparian rights; or
  (3) Prohibit the construction of any new piers along the Patuxent and financially compensate the affected holders or riparian rights
- Master Plan declines to do any of the above and instead imposes a permanent moratorium on construction of commercial piers pending "more detailed planning of the expanded bulkhead"

**1998 and 2001**: State transfers highway, bulkhead, and rights of way to the County

**2009**: Calvert County enacts new Solomons Town Center Master Plan and Zoning Ordinance
- Prohibits construction of commercial piers longer than 117 feet in the C-3 sub-area located along the public boardwalk

**2012**:
- Donnelly and Solomons One submit joint application to the State, the County, and the Army Corps of Engineers to build commercial pier ("2012 Application")

**April 6, 2012**: Maryland Department of the Environment ("MDE") receives tidal wetlands license application from Donnelly and Solomons One

**June 1, 2012**: MDE rejects and returns 2012 Application

1

- Return is based on "uncertainty about whether Donnelly holds the necessary riparian right to construct a pier" and because the proposed pier does not comply with the Wetlands Act of 1970
- No other plaintiffs submit a tidal wetlands application, nor does Donnelly revise his initial application

**June 1, 2012**: County denies 2012 Application
- Finds no contractual right to build piers off the bulkhead, says:
    - Says if such a right existed, it was terminated by the amendment to the Solomons Town Ordinance prohibiting such piers

**August 22, 2012:** Donnelly, Solomons One, Solomons Two, DiGiovanni's Dock of the Bay, James Seymour, and Prime Island Properties, LLC file a complaint against the State of Maryland and Board of Commissioners of Calvert County ("County") in Circuit Court for Calvert County

**July 12, 2013**: Circuit Court for Calvert County grants summary judgment in favor of Plaintiffs
- Finds Plaintiffs have contractual right to construct piers on the Patuxent River, subject to approval from the Army Corps of Engineers
- Finds MDE and County breached Donnelly's contractual rights when they denied the 2012 Application
- Defendant County appeals to Maryland Court of Special Appeals ("CSA")

**April 20, 2015**: CSA affirms judgment of Circuit Court for Calvert County
- Finds applicants' right to construct a pier in the Patuxent is based on contractual rights rather than riparian land ownership
- June 1, 2012 denial of application by MDE deemed to operate as a final administrative decision
- CSA remands to Circuit Court for trial on damages

**June 23, 2016**: State moves for summary judgment in Circuit Court for Calvert County.
- Argues that there is "no longer any controversy between the parties for any breach of contract by the State" and "Plaintiffs are free to submit an application for a tidal wetlands license to MDE and construct a pier"

**July 14, 2016**: Circuit Court for Calvert County orally grants State's motion for summary judgment on the issue of damages.
- Says County's only promised to allow Plaintiffs to build piers, not to recover money damages

**August 11, 2016:** Trial on damages against the County in Circuit Court for Calvert County
- Donnelly presents expert testimony based on "highest and best use" as of 2016 (a new pier project not proposed in his 2012 Application)
- Circuit court rules that the testimony is inadmissible because project was "a different plan from the time of the breach," which Court says was in 2012
- Donnelly again argues for a calculation of damages based on highest and best use as of the trial date

- County moves for judgment on the grounds that jury has been discharged and no substantive evidence of damages was admitted
- Circuit Court denies the County's motion and instructs parties to submit written offers of proof
- County moves for judgment and Donnelly moves for new trial

**November 28, 2016**: Circuit Court denies Donnelly's motion for a new trial and grants County's motion for judgment
- Holds: Donnelly may elect a monetary remedy for the FMV of the pier right breach as of the time of the breach, which Court says is June 13, 2012
- Further holds County may not exercise its zoning authority to extinguish Plaintiffs' vested contract right to build a pier for any purpose
- Plaintiffs appeal Circuit Court's grant of judgment in favor of the County
- County files cross-appeal challenging ruling that Donnelly's pier right is not subject to the County's zoning authority

**June 21, 2019**: U.S. Supreme Court decides *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), reversing state-court litigation requirement of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 472 U.S. 172, 193 (1985)

**November 14, 2019**: CSA affirms judgment of Circuit Court for Calvert County
- Most importantly, holds that Plaintiffs had no right to compensation for piers because Plaintiffs only had unvested riparian rights
- Also holds County cannot be bound by agreement to suspend its zoning authority
- Observes, by way of *obiter*, that even if Plaintiffs had pier rights that were breached by Defendants, breach would have occurred in 2012, when County last denied Plaintiffs' pier application.
- Concurs with trial court that, since 2012 was the date of the breach, Donnelly failed in his proof because he only offered proof of FMV as of trial date, 2016.
- In either event, Plaintiffs held entitled to no compensation

**January 2, 2020**: Donnelly files petition for writ of certiorari with the Maryland Court of Appeals

**March 27, 2020**: Maryland Court of Appeals denies certiorari

**December 17, 2020**: Donnelly, DiGiovanni's Dock of the Bay, Inc., Prime Island Properties LLC, Conner LLC, Solomons Island Yacht Club, Inc. and Christopher J. Moore file present Complaint in federal court

**V. CHARLES DONNELLY, *et al.* v. STATE OF MARYLAND, *et al.***
**Civil No. 20-3654-PJM**

---

**APPENDIX B**

**Reasons for Nonperformance of Contract and Restitution**

I.    **Failure of Consideration**

   A.  *Tyler v. Capitol Indemnity Ins. Co.,* 206 Md. 129, 134, 110 A.2d 528 (1955)
       (recognizing that "'If [an] option goes so far as to render illusory the promise of the
       party given the option, there is indeed no sufficient consideration, and therefore no
       contract....'") (quoting 1 *Williston on Contracts,* § 141 (Rev. Ed.)).

   B.  Restatement (Second) of Contracts 2d § 77 cmt. a (1981) ("Where the apparent
       assurance of performance is illusory, it is not consideration for a return promise.").

II.   **Mistake**

   A.  Restatement (Third) of Restitution and Unjust Enrichment § 5 (Am. Law. Inst. 2011):

      (1) A transfer induced by invalidating mistake is subject to rescission and restitution.
          The transferee is liable in restitution as necessary to avoid unjust enrichment. . . .
      (2) An invalidating mistake may be a misapprehension of either fact or law. There is
          invalidating mistake only when
             (a) but for the mistake the transaction in question would not have taken place;
                 and
             (b) the claimant does not bear the risk of the mistake.
      (3)  A claimant bears the risk of a mistake when
             (a) the risk is allocated to the claimant by agreement of the parties;
             (b) the claimant has consciously assumed the risk by deciding to act in the face
                 of a recognized uncertainty; or
             (c) allocation to the claimant of the risk in question accords with the common
                 understanding of the transaction concerned.
      (4) A claimant does not bear the risk of a mistake merely because the mistake results
          from the claimant's negligence.

   B.  *Farnsworth on Contracts* (4th ed.), Types of Mistake, § 9:2:

         . . . Sometimes a contracting party has an erroneous perception about a statute,
         regulation, or judicial decision, or the legal consequences of its acts . . . the modern
         view is that the existing law is part of the state of facts at the time of the agreement.
         Therefore, most courts will grant relief for such a mistake, as they would for any
         other mistake of fact.

1

**III.    Frustration of Purpose**

  A.  *See generally* Restatement (Second) of Contracts Ch. 11 (Am. Law. Inst. 1981).

  B.  *See Farnsworth on Contracts* (4th ed.), Frustration of Purpose, § 9.7.

  C.  *See* R.G. McElroy & Glanville Williams, *The Coronation Cases—I*, IV The Modern Law Review 241 (Apr. 1941); R.G. McElroy & Glanville Williams, *The Coronation Cases—II*, V The Modern Law Review 1 (July 1941).

**IV.    Impossibility or Impracticability of Performance**

  *See generally* Restatement (Second) of Contracts Ch. 11 (Am. Law. Inst. 1981).

**V.    Restitution**

  A.  Restatement (Third) of Restitution and Unjust Enrichment § 34 (Am. Law. Inst. 2011):

  (1) A person who renders performance under a contract that is subject to avoidance by reason of mistake or supervening change of circumstances has a claim in restitution to recover the performance or its value, as necessary to prevent unjust enrichment. If the case is one in which the requirements of § 54 can be met, the remedy of rescission and restitution permits the reversal of the transaction without the need to demonstrate unjust enrichment.
  (2) For purposes of subsection (1):
      (a) the value of a nonreturnable contractual performance is measured by reference to the recipient's contractual expectations; and
      (b) the recipient's liability in restitution may be reduced to allow for loss incurred in reliance on the contract.

  B.  Restatement (Third) of Restitution and Unjust Enrichment § 54 (Am. Law. Inst. 2011):

  (1) A person who has transferred money or other property is entitled to recover it by rescission and restitution if
      (a) the transaction is invalid or subject to avoidance for a reason identified in another section of this Restatement, and
      (b) the further requirements of this section may be satisfied.
  (2) Rescission requires a mutual restoration and accounting in which each party
      (a) restores property received from the other, to the extent such restoration is feasible,
      (b) accounts for additional benefits obtained at the expense of the other as a result of the transaction and its subsequent avoidance, as necessary to prevent unjust enrichment, and

(c) compensates the other for loss from related expenditure as justice may require.

(3)  Rescission is limited to cases in which counter-restitution by the claimant will restore the defendant to the status quo ante, unless

(a) the defendant is fairly compensated for any deficiencies in the restoration made by the claimant, or

(b) the fault of the defendant or the assignment of risks in the underlying transaction makes it equitable that the defendant bear any uncompensated loss.

(4) Rescission is appropriate when the interests of justice are served by allowing the claimant to reverse the challenged transaction instead of enforcing it. As a general rule:

(a) If the claimant seeks to reverse a transfer induced by fraud or other conscious wrongdoing, the limitation described in subsection (3) is liberally construed in favor of the claimant.

(b) If the claimant seeks rescission instead of damages as a remedy for material breach of contract (§ 37), the limitation described in subsection (3) is employed to prevent injustice to the defendant from the reversal of a valid and enforceable exchange.

(c) If rescission would prejudice intervening rights of innocent third parties, the remedy will on that account be denied.

(5)  Restitution or a tender of restitution by the claimant is not a prerequisite of rescission if affirmative relief to the claimant can be reduced by (or made subject to) the claimant's reciprocal obligation of restitution.

(6) Prejudicial or speculative delay by the claimant in asserting a right of rescission, or a change of circumstances unfairly prejudicial to the defendant, justifies denial of the remedy.

C. *Restatement (Second) of Contracts* § 198 (Am. Law. Inst. 1981):

"A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if

(a) he was excusably ignorant of the facts or of legislation of a minor character, in the absence of which the promise would be enforceable, or

(b)  he was not equally in the wrong with the promisor."

D. *Corbin on Contracts* § 1367, *Restitution as a Remedy*:

"We have, therefore, four general types of cases in which the availability of restitution as a remedy must be considered: (1) the cases in which the defendant is guilty of breach of contract, the existing type of impossibility being such as not to operate as a discharge and not to be a good defense; . . . In the first of these four classes, we assume that the defendant is in default of duty and a contract breaker. Although the defendant's performance may have become impossible, he is not discharged.  Against such a defendant, the plaintiff is entitled to the usual remedies.

3

He will not be given a decree for specific performance, if such a decree would be impossible of enforcement; but he has a right to compensatory damages measured in accordance with the rules of law applicable to this remedy."

E.  *See also Berry & Gould P.A. v. Berry*, 360 Md. 142, 151 (2000) (quoting *Restatement (Second) of Restitution* § 1 ("A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment."); *Mogavero v. Silverstein*, 142 Md. App. 259, 276 (2002) ("The measure of damages for unjust enrichment is the gain to the defendant not the loss to the plaintiff.")

F.  *Shoreham Devs., Inc. v. Randolph Hills, Inc.*, 269 Md. 291, 300, 305 A.2d 465, 471 (1973) (citing *Corbin on Contracts* § 1107) (1964)) ("The purpose of restitution is to put the injured party in as good a position as that occupied before the contract was made.").

4